THE STATE, EX REL. DOERSAM, APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO, APPELLANT.

[Cite as State, ex rel. Doersam, *v.* Indus. Comm. (1989), 45 Ohio St. 3d 115.]

(No. 88-51—Submitted June 6, 1989—Decided August 23, 1989.)

*Ward, Kaps, Bainbridge, Maurer, Bloomfield & Melvin* and *William J. Melvin,* for appellee.

*Anthony J. Celebrezze, Jr.,* attorney general, *Merl H. Wayman, Gerald H. Waterman* and *Michael L. Squillace,* for appellant.

*Stewart R. Jaffy & Associates Co.,*

*L.P.A.*, and *Stewart R. Jaffy*, urging affirmance for *amici curiae*.

DOUGLAS, J. The issue before us is whether R.C. 4123.59(B), as amended by Am. Sub. H.B. No. 714, effective January 1, 1976, is constitutional *or is* unconstitutional in whole or in part.

R.C. 4123.59(B) provides for death benefits to wholly dependent persons of a decedent whose death is caused by a work-connected injury or occupational disease. The pertinent provisions of R.C. 4123.59(B) are:

"In case an injury to or an occupational disease contracted by an employee causes his death, benefits shall be in the amount and to the persons following:

"* * *

"(B) If there are wholly dependent persons at the time of the death, the weekly payment shall be sixty-six and two-thirds per cent of the average weekly wage, but not to exceed a maximum aggregate amount of weekly compensation which is equal to sixty-six and two-thirds per cent of the statewide average weekly wage as defined in division (C) of section 4123.62 of the Revised Code, and not in any event less than a minimum amount of weekly compensation which is equal to fifty per cent of the statewide average weekly wage as defined in division (C) of section 4123.62 of the Revised Code, regardless of the average weekly wage; *provided however, that if the death is due to injury received or occupational disease first diagnosed after January 1, 1976, the weekly payment shall be sixty-six and two-thirds per cent of the average weekly wage but not to exceed a maximum aggregate amount of weekly compensation which is equal to the statewide average weekly wage as defined in division (C) of section 4123.62 of the Revised Code; provided that when any claimant is receiv-*

*ing total disability compensation at the time of death the wholly dependent person shall be eligible for the maximum compensation provided for in this section.* * * *''* (Emphasis added.)

The italicized language was added by the amendment which was effective January 1, 1976. From the entire section, as amended, several things can be gleaned:

(1) For any persons to be eligible at all to receive benefits pursuant to the section, the death of the decedent worker must be related to and caused by his industrial injury or occupational disease;

(2) for any person or persons to be eligible to receive benefits, that person or those persons must have been wholly dependent (as defined in R.C. 4123.59[D]) on the decedent at the time of his death;

(3) that persons who are wholly dependent on a decedent who was receiving *total disability* benefits (whether temporary or permanent) at the time of his death are treated differently from those wholly dependent persons whose decedent was receiving less than total disability benefits; and

(4) that the section provides for benefits to be paid wholly dependent persons whose decedent was injured, or whose occupational disease was first diagnosed, after January 1, 1976, which are different from those benefits paid where the decedent's injury or occupational disease occurred on or before January 1, 1976, thereby creating a classification for receipt of benefits based on the date of injury.

Accordingly, the statute provides that where the injury in question occurred *on or before* January 1, 1976, dependents, upon the death of the injured worker, are limited *to a maximum* death benefit of two-thirds of the statewide average weekly wage regardless of the deceased worker's average weekly wage. If the worker

was injured after January 1, 1976, dependents are eligible to receive benefits, *as a maximum,* based upon one hundred percent of the statewide average weekly wage.

It is now necessary to apply the foregoing analysis to the facts of the instant case.

Doersam had sustained, on November 8, 1973, injury in the course of his employment. His workers' compensation claim was initially allowed for myocardial infarction. At the time of his injury, Doersam's average weekly wage was $376.25. On September 27, 1983, Doersam died. At the time of his death, Doersam was working and, of course, was *not* receiving total disability benefits.

Appellee, Doersam's widow, filed a claim on behalf of herself and her minor child seeking death benefits. The death claim was allowed by a district hearing officer who obviously found, pursuant to the statutory requirements, that the death of Doersam was the result of an industrial injury and that appellee was a wholly dependent person. It is also clear that Doersam was *not* receiving total disability benefits and, therefore, the part of the statute relating to total disability does not apply.

The hearing officer then made a specific monetary weekly award to appellee and her minor child. To arrive at the amount of an award, it is necessary, no matter how the statute is construed and applied, to know the *worker's average weekly wage* at the time of injury and the *statewide average weekly wage* at the time of death. While there is some discrepancy in the record as to these figures, it is now agreed that Doersam's average weekly wage at the time of injury was $376.25 and the statewide average weekly wage at the time of death (1983) was $321.

Applying the statute as written, the hearing officer determined that Doersam's injury occurred before January 2, 1976. Therefore, applying the "not to exceed" language of the statute, appellee was entitled to receive two-thirds of her decedent's average weekly wage of $376.25 or two-thirds of the statewide weekly wage of $321, WHICHEVER IS LESS. Since two-thirds of $376.25 is $250.83 and two-thirds of $321 is $214, appellee was awarded the lesser sum of $214 weekly.

By the amendment to R.C. 4123.59 (B), effective January 1, 1976, the General Assembly created a new class of eligible dependents of workers injured *after* January 1, 1976. These dependents were entitled, as a maximum, to receive *one hundred percent* of the statewide average weekly wage rather than, as a maximum, the two-thirds of the statewide average weekly wage for workers injured on or prior to January 1, 1976.

Obviously, many workers have been injured since January 1, 1976. Upon the death of such a worker, which is causally related to the industrial injury, a wholly dependent person is now entitled to receive two-thirds of the worker's average weekly wage or *one hundred percent* of the statewide average weekly wage (rather than two-thirds of the statewide average weekly wage), WHICHEVER IS LESS.

Thus, if Doersam had been injured on *January 2, 1976* (and we assume the same average weekly wage for him — $376.25 — and the same *statewide* average weekly wage — $321), appellee would have been entitled to two-thirds of her decedent's average weekly wage or one hundred percent of the statewide average weekly wage, WHICHEVER IS LESS. As we have seen earlier, two-thirds of Doersam's

average weekly wage of $376.25 is $250.83. However, the ceiling is no longer *two-thirds* of the statewide average. The ceiling, pursuant to the amendments, is *one hundred percent* of the statewide average of $321. Accordingly, appellee would be entitled to the *lesser* of $250.83 or $321. Thus, appellee's weekly award would be $250.83.

In summary, applying the statute *as written*, appellee would be entitled to $214 per week if decedent's injury occurred *before* January 2, 1976 and $250.83 per week if decedent's injury occurred *after* January 1, 1976. The language that brings about this curious result reads: "* * * if the death is due to injury received or occupational disease first diagnosed * * *" and was inserted in R.C. 4123.59(B) as part of the amendments promulgated in Am. Sub. H.B. No. 714, effective January 1, 1976.

It is this language, in part, that brought about appellee's equal-protection-of-the-law challenge in her original action in the court of appeals. It is this language, in part, that led the court of appeals to find that "* * * the statute violates the equal protection clause." It is this language that we now review to determine if it brings about the violation of the constitutional rights of certain "wholly dependent" persons.

In part, the Fourteenth Amendment to the United States Constitution provides:

"* * * [N]o *State* shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; * * * nor deny to any person within its jurisdiction the equal protection of the laws." (Emphasis added.)

When adopted and subsequently interpreted, the Equal Protection Clause introduced a new concept into constitutional analysis. Simply stated, the clause requires that individuals be treated in a manner similar to others in like circumstances. As such, this requirement is an independent constitutional guarantee. Accordingly, it is more of a guarantee than might appear at first glance.

We accept without question that the clause applies to the historically familiar assertions that all persons must stand equal before the law, and that justice must be blind to color, wealth, rank, or privilege. But the great clause encompasses more! It requires not only that there be fair and equal enforcement of laws, but also that the laws themselves be "equal."

The Fourteenth Amendment was adopted in 1868. As early as 1886, the court in *Yick Wo* v. *Hopkins* (1886), 118 U.S. 356, 369, said that "* * * [t]he equal protection of the laws is a pledge of the protection of *equal laws*. * * *" (Emphasis added.) This does not mean, however, that *any* law passed by a legislative body which "classifies" persons is suspect under the Equal Protection Clause. The demand for "equal protection" cannot be a demand that laws apply universally to all persons. By the very nature of the work of the legislature, it must, if it is to act at all, impose special burdens upon or grant special benefits to special groups or classes of individuals.

Thus, the "* * * Fourteenth Amendment to the Constitution of the United States does not prohibit legislation which is limited either in the objects to which it is directed, or by the territory within which it is to operate. *It merely requires that all persons subjected to such legislation shall be treated alike * * *.*" (Emphasis added.) *Hayes* v. *Missouri* (1887), 120 U.S. 68, 71. In *Barbier* v. *Connolly* (1885), 113 U.S. 27, 31-32, the court said that "* * * neither the [fourteenth] amend-

ment — broad and comprehensive as it is — nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having these objects in view, must often be had * * *. Special burdens are often necessary for general benefits * * *. Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed, not to impose unequal or unnecessary restrictions upon any one, but to promote, with as little inconvenience as possible, the general good. * * *"

In sum, then, a classification of persons will not be suspect when the law establishing the classification relates to a legitimate governmental purpose. If the means employed by the law to achieve its ends is the classification of persons who are accorded differing benefits or assessed differing burdens, the law will be tested under the equal-protection guarantee. If the classification does not meet or does not have a sufficient relationship to a required governmental purpose, then the law cannot withstand scrutiny under the Equal Protection Clause. "* * * Equal protection of the laws requires the existence of reasonable grounds for making a distinction between those within and those outside a designated class. * * *" *State, ex rel. Nyitray,* v. *Indus. Comm.* (1983), 2 Ohio St. 3d 173, 175, 2 OBR 715, 717, 443 N.E. 2d 962, 964.

There can be no question that R.C. 4123.59(B), as written, legislatively creates separate classifications of "wholly dependent" persons based only on the date when an injury to a worker occurred. Since equal protection embodies the guarantee that people in similar circumstances will be dealt with in a similar manner, and R.C. 4123.59(B) clearly does not do so, our next inquiry must be whether the establishment of the separate classes was for the advancement of any legitimate governmental purpose. If it was, then the legislation meets constitutional muster. If not, then a violation of equal protection must be found.

Appellant commission argues that the 1976 amendment, now under scrutiny, is rationally related to a legitimate government objective. That objective, says appellant, is "* * * to provide dependants [*sic*] of deceased workers, receiving total disability benefits on the date of their death, the opportunity to be *eligible* for an award up to the maximum statutory amount." (Emphasis *sic*.) How that objective applies to this case, where total disability benefits are not involved, is not made clear by appellant. Additionally, providing for increased benefits for persons whose decedent was injured *after* January 1, 1976, does not address how that satisfies equal protection for those who receive less, pursuant to the classification, because their decedent was injured *before* January 2, 1976. We respectfully reject this argument as not persuasive and unresponsive.

Appellant also, but somewhat more weakly, argues that the state has "* * * a legitimate interest in the fiscal integrity of its social and economic programs. * * *" This may be so but in this case we reject the argument for two reasons.

First, as appellant concedes, this court has rejected classifications in legislation to ensure the financial stability of the State Insurance Fund.

"* * * However, conserving funds is not a viable basis for denying compensation to those entitled to it." *State, ex rel. Nyitray,* v. *Indus. Comm., supra,* at 177, 2 OBR at 719, 443 N.E. 2d at 966. We are not persuaded to now reach an opposite conclusion.

Second, appellant's argument falls of its own weight. The 1976 amendment increased benefits to those injured *after* January 1, 1976. Obviously, this is an ever-growing group contrasted with the ever-declining group of those injured prior to January 2, 1976. It would seem to be logical that if the governmental purpose was to preserve the financial integrity of the State Insurance Fund, the General Assembly would not have created a larger class of persons to receive greater benefits — which is exactly what the amendment was designed to do. For the reasons stated, we also reject this argument of appellant.

Having rejected appellant's arguments, we now search to find any other arguable legitimate governmental purpose for the legislature's establishing the classifications in question. Search as we might, and applying the tests set forth in *Barbier,* we simply cannot find that the legislated classifications tend to promote health, peace, morals, education or the good order of the people. Nor do the classifications increase the industry of the state, develop our resources, or add to the state's wealth or prosperity. Accordingly, we find that the 1976 amendment created a suspect class and, therefore, is violative of the guarantee of protection of equal laws.

To what result, then, does this bring us? In our previous *Doersam* decision (1988), which today we reconsider, we found that the classification scheme "* * * unconstitutionally differentiates between claimants who are wholly dependent upon their decedent. * * *" *Id.* at 204, 533 N.E. 2d at 324. The majority solution was to *invalidate* "* * * those portions of the statute which raise the benefit ceiling to one hundred percent of the SAWW [statewide average weekly wage] for certain dependents. * * *" *Id.* Upon reconsideration, we now reach a different conclusion.[1]

We do not find it necessary to strike the entire 1976 amendment to R.C. 4123.59(B). Indeed, it is our obligation to preserve as much of the General Assembly's handiwork as is constitutionally permissible. We are assisted in this responsibility by R.C. 1.50, which provides:

"If any provisions of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related section which can be given effect without the invalid provision or application, *and to this end the provisions are severable.*" (Emphasis added.)

In explaining severability, the court in *State, ex rel. King,* v. *Rhodes* (1967), 11 Ohio St. 2d 95, 101, 40 O.O. 2d 109, 112, 228 N.E. 2d 653, 657, said that "[t]he test of severability is whether the remaining parts of the article, standing alone and without reference to the unconstitutional sections, can be effective and operable. * * *"

---

[1] The effect of our previous decision was to eliminate increased benefits for *all* wholly dependent persons. If anything is clear, it is that the General Assembly had no such intent. In fact, at least one purpose of the 1976 amendment was to *increase* benefits for the vast majority of wholly dependent persons.

As we have seen, appellee would receive, applying R.C. 4123.59(B) as written, the sum of $214 as a weekly benefit. This is because her decedent's injury occurred *before* January 2, 1976. For *other* wholly dependent persons whose decedents were injured *after* January 1, 1976, a larger award would be possible. In appellee's case this award, had her decedent been injured after January 1, 1976, would be $250.83—the *lesser* of the statewide average weekly wage *or* sixty-six and two-thirds of decedent's average weekly wage. Yet appellee *and* others entitled to benefits under R.C. 4123.59(B) are *all* wholly dependent persons of decedents who have died from industrial injuries and are thus entitled to benefits.

The only reason these persons, who are similarly situated, are treated differently is the inclusion by the General Assembly of the words "if the death is due to injury received or occupational disease first diagnosed." These words create the suspect class. Accordingly, we find these words to be violative of the mandate that no person shall be denied equal protection of the laws and we order that they be severed and stricken from the statute. The remainder of the statute, at least as applied to these facts, can be effective and operable.

Our decision in *State, ex rel. Doersam,* v. *Indus. Comm.* (1988), *supra,* is vacated. The judgment of the court of appeals is affirmed for the reasons stated herein. Appellant is ordered to provide benefits to all wholly dependent persons entitled thereto pursuant to R.C. 4123.59(B), in accordance with the provisions of that section but without consideration of date of injury.

Appellee is awarded final judgment and the benefits to be paid her shall be $250.83 weekly.

*Judgment affirmed.*

SWEENEY, H. BROWN and RESNICK, JJ., concur.

WRIGHT, J., concurs in part and dissents in part.

MOYER, C.J., and HOLMES, J., dissent.

WRIGHT, J., concurring and dissenting in part. I concur in the majority's finding that the amendment to R.C. 4123.59(B) violates the Equal Protection Clause of the Fourteenth Amendment, but I would adhere to our first ruling wherein it was determined that the amendment should be severed and the remediation left to the General Assembly. I had personally hoped that remediation would be prompt and retroactive, but that decision should be left to the wisdom of our elected lawmakers.

While I agree with the finding of a violation of the Equal Protection Clause, I do not agree that "the 1976 amendment created a suspect class." See *Graham* v. *Richardson* (1971), 403 U.S. 365, 371-372, where it was definitively stated that:

"Under traditional equal protection principles, a state retains broad discretion to classify as long as its classification has a reasonable basis. * * * This is so in 'the area of economics and social welfare.' * * * But the [United States Supreme] Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close [or strict] judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority * * * for whom such heightened judicial solicitude is appropriate." (Citations omitted.)

Wholly dependent persons entitled to some award under workers' compensation laws are clearly not a "discrete and insular" minority. Nor are

they entitled to the less demanding "heightened scrutiny" standard of review which has been applied only in cases involving discriminatory classifications based upon sex or illegitimacy. See *Plyler* v. *Doe* (1982), 457 U.S. 202. The most relaxed standard of review is the rational relationship test and that is the one that applies herein. Under that test, "[s]ocial and economic legislation * * * 'carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality.' " *Kadrmas* v. *Dickinson Pub. Schools* (1988), 487 U.S. ___, 101 L. Ed. 2d 399, 412, 108 S.Ct. 2481, 2489. The amendment to R.C. 4123.59(B) fails this test for the very reasons set forth by the majority.

Finally, I believe that the entire amendment must be stricken rather than the court picking and choosing words to delete from the amendment. The test for severability was set forth in *Geiger* v. *Geiger* (1927), 117 Ohio St. 451, 466, 160 N.E. 28, 33:

" '(1) Are the constitutional and unconstitutional parts capable of separation so that *each may be read and may stand by itself*? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?' " (Emphasis added.)

As conceded by the majority, the previous version of R.C. 4123.59 was constitutional; it is the amendment which violates the Equal Protection Clause, and it is clear that the General Assembly meant in that amendment to give a lesser award to those situated as the appellee for reasons that still remain unclear. The phrase selected for severance by the majority—"if the death is due to injury received or occupational disease first diagnosed" —does not stand by itself as required by the first prong of the test in *Geiger*.

Further, for this court to "amend" the amendment and establish that all recipients are entitled to a possible award of one hundred percent of the statewide average weekly wage would be contrary to the rules of statutory construction, notwithstanding the presence of R.C. 1.50. The United States Supreme Court in *Frost* v. *Corporation Comm. of Okla.* (1929), 278 U.S. 515, addressed the issue of the severability of an unconstitutional amendment that violated the Equal Protection Clause from a previously enacted constitutionally valid statute. The court reasoned:

"* * * If valid, its practical effect would be to repeal by implication the requirement of the existing statute * * *. But since the amendment is void for unconstitutionality, it cannot be given that effect, *'because an existing statute cannot be recalled or restricted by anything short of constitutional enactment.'* * * *

"* * *

"Here it is conceded that the statute, before the amendment, was entirely valid. When passed, it expressed the will of the legislature which enacted it. Without an express repeal, a different legislature undertook to create an exception, but, since that body sought to express its will by an amendment which, being unconstitutional, is a nullity and, therefore, powerless to work any change in the existing statute, that statute must stand as the only valid expression of the legislative intent." (Emphasis added.) *Id.* at 526-527. (See, also, *Eberle* v. *Michigan* [1914], 232 U.S. 700.)

The intent of the entire 1976 amendment was to increase benefits in

an unconstitutional manner and nullify a valid statute. As such, it is not possible to meet the requirements of the second test, in *Geiger, supra.* We should follow the rationale of *Geiger* and *Frost, supra,* and the dictates of R.C. 1.50, and adhere to this court's first decision to sever the unconstitutional amendment. Having done that, we will have performed our role and our elected lawmakers can then perform their role.

Accordingly, I must respectfully dissent from the reasoning and result achieved today, well meaning though it may be.

MOYER, C.J., dissenting. I must respectfully dissent from the majority's holding and opinion for the same reasons stated in my dissent and concurrence in *State, ex rel. Doersam, v. Indus. Comm.* (1988), 40 Ohio St. 3d 201, 204-205, 533 N.E. 2d 321, 325.

HOLMES, J., concurs in the foregoing dissenting opinion.